397 So.2d 715 (1981)
Rolando Otero HERNANDEZ, Appellant,
v.
STATE of Florida, Appellee.
Robert ROSENBLATT, Appellant,
v.
STATE of Florida, Appellee.
William CLAY, Appellant,
v.
STATE of Florida, Appellee.
Nos. GG-25, EE-490 and EE-401.
District Court of Appeal of Florida, First District.
April 7, 1981.
Rehearing Denied May 19, 1981.
*716 Paul Morris and Bennett H. Brummer, Asst. Public Defenders, Miami, for appellant Hernandez.
Louis M. Jepeway, Jr., of Jepeway & Jepeway, Miami, for appellants Rosenblatt and Clay.
Jim Smith, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., Tallahassee, for appellee.
LILES, WOODIE A. (Retired), Associate Judge.
"Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization. Its roots run deep into Greek and Roman times. Even in the Dark Ages, when so many other principles of justice were lost, the idea that one trial and one punishment were enough remained alive through the canon law and the teachings of the early Christian writers. By the thirteenth century it seems to have been firmly established in England, where it came to be considered as a `universal maxim of the common law.' It is not surprising, therefore, that the principle was brought to this country by the earliest settlers as part of their heritage of freedom, and that it has been recognized here as fundamental again and again. Today it is found, in varying forms, not only in the Federal Constitution, but in the jurisprudence or constitutions of every State, as *717 well as most foreign nations. It has, in fact, been described as a part of all advanced systems of law and as one of those universal principles "of reason, justice, and conscience, of which Cicero said: `Nor is it one thing at Rome and another at Athens, one now and another in the future, but among all nations it is the same.'" Bartkus v. Illinois, 359 U.S. 121, 151-154, 79 S.Ct. 676, 695-697, 3 L.Ed.2d 684 (1959).
Laudatory and true as these words appear, they were uttered in the dissent by Justice Black. Justice Frankfurter, along with a majority of the Court, having ruled otherwise, said, quoting from Moore v. Illinois, 55 U.S. (14 How.) 13 (1852), at 20, 14 L.Ed. 306:
"Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both."
The majority went on to hold that under the doctrine of dual sovereignty, one may in fact be placed twice in jeopardy without being deprived of his constitutional protection. This is true, said the Court, for the reasons that the Fifth Amendment is not applicable to the states and that both federal and state judicial systems needed to be free "to develop a rational and just body of criminal law," which would be accomplished by adhering to the dual sovereignty doctrine rather than extending the application of the Fifth Amendment to the states. 359 U.S., at 138, 79 S.Ct., at 686.
This Court is called upon by the appellant here to set aside and vitiate the doctrine of dual sovereignty by recognizing that the holding in Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), has been overruled in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) wherein the Fifth Amendment was applied to the states through the Fourteenth Amendment. Indeed, the decisions in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), and Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), also seem to imply a broad rejection of the dual sovereignties theory.[1] In those cases the court "rejected the dual sovereignty argument and allowed a defendant in one sovereignty to assert rights based on the actions of another sovereignty's officials." People v. Cooper, 398 Mich. 450, 247 N.W.2d 866, 869 (1975). In view of Supreme Court decisions subsequent to Benton, however, we must restrain ourselves from the temptation to declare that Bartkus no longer governs. See United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), wherein the Court reaffirmed the Bartkus holding.
We are convinced that the Fifth Amendment bar against double jeopardy, as well as the prohibition against double jeopardy found in Article I, Section 9, of the Constitution of the State of Florida, often has been an illusory protection. This is so in spite of the rhetorically stated adherence to the protection as well as the pronouncement in Benton, supra. We can, however, take comfort in the Supreme Court's decision in Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), wherein Justice Burger denied that the doctrine of dual sovereignty applied as between a state and its municipalities, which were fictional sovereignties at best. In our view, this opinion overruled the Supreme Court of Florida's opinions in Theisen v. McDavid, 34 Fla. 440, 16 So. 321 (1894), and Hilliard v. City of Gainesville, 213 So.2d 689 (Fla. 1968), and the opinion in which this author joined in Waller v. State, 213 So.2d 623 (Fla. 2nd DCA 1968), all of which alluded to the permissibility of successive municipal state *718 prosecutions arising from the same criminal incident.[2]
The instant case presents this Court with the age old problem of determining, under the circumstances, whether Rolando Otero Hernandez has been denied the constitutional protection, guaranteed by the Fifth Amendment of the United States Constitution and Article I, Section 9, of the Constitution of the State of Florida, against twice being placed in jeopardy for the same offense. On August 30, 1976, a thirty-nine count information was filed against Hernandez in the Eleventh Judicial Circuit.[3] He had previously been indicted and tried in the Federal District Court for the Southern District of Florida. Among the federal charges of significance to this opinion were conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 844(i) (1976), attempt to destroy property with an explosive in violation of 18 U.S.C. § 844(i) (1976), and possession of a destructive device in violation of 26 U.S.C. § 5861 (d) (1976). With regard to the placement of bombs in the Miami International Airport, these charges cumulatively carried a potential twenty-five year prison sentence. These charges were repeated in each of numerous counts accusing appellant of placing bombs in various and sundry public buildings in and around the City of Miami, in addition to the airport. On August 24, 1976, appellant was acquitted of all federal charges. The State then filed and proceeded to trial on its thirty-nine count information and appellant was acquitted of all but five counts stemming from the airport incident:

Count 1: unlawful possession of explosive in violation of Section 552.22, Fla. Stat., punishable up to fifteen years' imprisonment.

Count 10: unlawful possession of explosive in violation of Sections 552.101, 552.22, Fla. Stat., punishable up to five years' imprisonment.

Count 21: attempted first degree murder in violation of Sections 782.04 and 777.04, Fla. Stat., punishable up to thirty years' imprisonment.

Count 26: first degree arson in violation of Section 806.01(1), and 775.087(2), Fla. Stat., punishable up to thirty years' imprisonment.

Count 32: unlawfully discharging destructive device in violation of Section 790.161(2), Fla. Stat., punishable up to thirty years' imprisonment.
The maximum potential sentence faced by appellant upon conviction of these five counts totalled 110 years.
Prior to the trial, Hernandez sought to have the charges dismissed for the reason that his prosecution was barred by the federal and state prohibitions against double jeopardy. The trial judge heard argument, requested briefs, and ruled that the second trial was not prohibited. We believe the trial judge's ruling was correct, but we do not adopt his reasoning.
If this were a case which required affirmance based solely on a strict application of the doctrine of dual sovereignty, this Court would be inclined to follow the approach enunciated first in Commonwealth v. Mills, 447 Pa. 163, 286 A.2d 638 (1971), and later adopted in People v. Cooper, 398 Mich. 450, 247 N.W.2d 866 (1975). In Cooper the Michigan Supreme Court, although recognizing that the concept of dual sovereignty may sometimes aid in maintaining a strong state as well as federal system of justice, expressed the view that Justice Frankfurter's reasoning in Bartkus had been seriously eroded by Benton, and voiced a preference for Justice Black's dissent in Bartkus, as the Pennsylvania Supreme Court had done in Mills. The court in Cooper went on to observe "that persons convicted in federal court only very rarely are prosecuted in state courts for offenses arising out of the *719 same criminal act," offering in explanation that the interests of the federal and state governments in prosecuting a criminal act frequently coincide. Cooper, 247 N.W.2d at 870. The Mills court had concluded its analysis by stating that in the future, prosecution by the State of Pennsylvania would not be permitted unless it appeared from the record that the interests of that state were substantially different from those of the initial prosecuting jurisdiction, and the Cooper court followed suit.
We have qualified our approval of these decisions, though, because in the instant case we lack the above-mentioned coincidence of interests.[4] The state information on its face indicates the divergence of the federal and state interests in this case. The federal charges, as can be seen, were for conspiracy to commit an offense against the United States and attempt to destroy property with explosives, as well as possession of a destructive device; and while those violations overlap the state charges to some extent, the state charges are far more encompassing. The state's interest in the protection of human life, for example, not apparently fostered in any of the charges in the federal indictment, is discernible in Count 21 of the information, attempted first-degree *720 murder, of which Hernandez was convicted. A second state interest not apparently served by the federal prosecution is embodied in Count 26 of the information charging appellant with first-degree arson. In addition, while it could be argued that unlawful possession of explosives was inherent in the federal conspiracy charge, the state charge commands a more severe maximum penalty. A considerable diversity in potential maximum sentences for the respective federal and state offenses such as exists in this case is one of the factors of the test announced in Cooper for determining whether substantially different interests are present. Cooper, at 871.
The record reveals that at 5:00 or 6:00 p.m., on October 17, 1975, Hernandez prevailed upon a friend, one Gonzalez, to drive him to the Miami International Airport to pick up another friend's automobile. While Gonzalez remained in the car, Hernandez proceeded to the terminal. He returned in about five minutes explaining that he could not find the car. At about 6:00 a.m. the following morning, the reservations clerk for Eastern Airlines received a telephone call from a person whose voice said:
"Listen carefully. This is not a joke. There are several bombs in the complex. The first will go off in a couple of minutes."
Two minutes later, a locker bank exploded, scattering debris around the detonated bomb in locker 5030. The remnants of the bomb found in locker 5030 indicated that the bomb was activated by a time delay mechanism allowing a delay of almost twelve hours. Reconstructing this evidence placed Hernandez at the airport precisely twelve hours before the bomb exploded, and a fingerprint expert identified a fingerprint lifted from the handle of locker 5030 as that of Hernandez. Through the use of voice exemplars, Catherine Simpson, the Eastern reservations clerk who had received the telephone warning, identified Hernandez's voice as being the voice she had heard. This evidence clearly shows that the state not only had a direct and viable interest in protecting its property from which intrastate flights came and went, but it also had a vital interest in protecting the lives of the citizens who sought services from the Miami International Airport, as well as the property at the airport. The disparities between the federal indictment and the state information are of great significance in this case; the charge of attempted first-degree murder alone manifests a state interest which outweighs any challenges based purely on the fictional nature of the dual sovereignties doctrine. We are therefore compelled to affirm the conviction, while at the same time voicing a strong belief in the integrity of this state's adherence to the prohibition against placing an individual twice in jeopardy for the same offense. The ills inherent in allowing successive federal-state prosecutions to go unscrutinized were enumerated in Commonwealth v. Mills, supra:
(1) It is in derogation of the principle that "no one should be twice vexed for the one and the same cause"; and (2) It destroys finality from the individual's standpoint and permits the governments with all their resources and power to make repeated attempts to convict, thus subjecting the accused to live in a continuous state of anxiety, insecurity and possible harassment.
The interest, however, that permits an affirmance of Hernandez's conviction is paramount to the interest sought to be protected by the federal government and is demonstrated rather substantially in the record. See People v. Gay, Mich., 289 N.W.2d 651 (1979).
During the course of the trial, the trial judge cited Appellant's lawyers, Rosenblatt and Clay, for contempt and entered judgments against them. They, too, have appealed. Rule 3.830, Fla.R.Cr.P., requires that prior to an adjudication of guilt of direct criminal contempt, "the judge shall inform the defendant of the accusation against him and inquire as to whether he has any cause to show why he should not be adjudged guilty of contempt by the court and sentenced therefor. The defendant shall be given the opportunity to present evidence of excusing or mitigating circumstances." Rule 3.830, Fla.R.Cr.P. Compliance with this rule is mandatory. Keezel v. State, 358 So.2d 247 (Fla. 4th DCA 1978); Ray v. State, 352 So.2d 110 (Fla. 1st DCA 1977).
Before adjudicating Rosenblatt guilty of contempt, the trial court did not inform him of the accusation against him nor inquire as to whether he could show cause why he should not be adjudged guilty of contempt, although he was given an opportunity to present mitigating circumstances afterwards. In addition, it is doubtful that Rosenblatt's conduct amounted to contempt. The trial court had orally cautioned counsel not to refer to a "federal jury" or a "federal trial", although they were permitted to speak of "prior court proceedings." Rosenblatt had said: "Well, didn't you testify to the jury that it appeared to be a minute hand?" Rosenblatt explained his use of the phrase "the jury" by saying he had been trained to advise a witness of the circumstances surrounding a prior inconsistent statement when attempting to impeach that witness. In any event, since that rule was not strictly complied with, the judgment of contempt against Rosenblatt must be reversed.
It is even more obvious, with regard to Appellant Clay, that the rule was not followed in adjudging him guilty of contempt. While arguing a motion, Mr. Clay was told by the court at one point not to say another word. Mr. Clay objected for the record, and the court immediately stated that Clay would be held in contempt. When Clay asked if he could offer an explanation of his conduct, he was told flatly that he could not and that if he did not keep still, he would be held in further contempt. This was clearly a violation of Rule 3.830.
Appellant raises other issues. We have carefully reviewed them and find no basis for reversing.
For the foregoing reasons, we affirm Hernandez's conviction and reverse the judgments of contempt against Clay and Rosenblatt.
AFFIRMED IN PART, REVERSED IN PART.
McCORD, J., and OWEN, WILLIAM C., Jr. (Retired), Associate Judge, concur.
NOTES
[1] Elkins held that evidence obtained by state officers through a search which would have violated the Fourth Amendment if conducted by federal authorities was not admissible in a federal prosecution. In Murphy, it was held that, under the Fifth Amendment, a state witness need not testify unless his immunity extended to federal as well as state prosecution.
[2] If questions remain as to the interpretation of the Supreme Court's Waller decision, see Waller v. State, 270 So.2d 26 (Fla. 2nd DCA 1972), they were put to rest by the adoption in 1972 of an amendment to Article V, Section 1, of the Florida Constitution, wherein municipal courts were abolished.
[3] Venue was changed to the First Judicial Circuit.
[4] The State urges us to affirm this case based on the doctrine pronounced in Strobhar v. State, 55 Fla. 167, 47 So. 4 (1908). However, we can find no guidance in that case. There it was hypothesized that, had a continuing offense been committed in both Georgia and Florida, the laws of both states would have been violated and prosecutions in both jurisdictions would have been permissible. There is nothing in the double jeopardy prohibition to prevent a sovereign state from enforcing its own laws within its geographic boundaries; while we do not reject the holding of Strobhar, it is not applicable in this case.