PEOPLE v GAY

PEOPLE v GERLOFS

Docket Nos. 61202, 60833. Argued April 3, 1979 (Calendar Nos. 5, 6). —Decided March 4, 1980.

Steven M. Gay was convicted by a jury in the United States District Court for the Western District of Michigan, Noel P. Fox, J., of bank robbery, assault with a dangerous weapon, and killing a bank teller, Connie M. Adams, while committing the robbery in 1974. His codefendant, Donald L. Gerlofs, was convicted of the first two crimes and acquitted of killing the bank teller while committing the robbery. The defendants were also charged in Kalamazoo Circuit Court with first-degree murder for the killing of Miss Adams during the commission of the armed robbery. The defendants moved to dismiss the state charges on the ground that the state prosecution violated the Double Jeopardy Clause. The Kalamazoo Circuit Court, Lucien F. Sweet, J., denied the motions. After further state and Federal litigation in the matter was completed, the defendants were separately tried and convicted by juries in Kalamazoo Circuit Court, Robert L. Borsos, J., of first-degree murder. The Court of Appeals, on defendant Gerlofs' motion for peremptory reversal, remanded his case to Kalamazoo Circuit Court for reconsideration of the double jeopardy issue in light of a decision of the Supreme Court announced while the case was on appeal. Judge Borsos found that defendant Gerlofs had been twice placed in jeopardy, set aside the conviction of first-degree murder, and dismissed the information. The Court of Appeals, D. C. Riley, P.J., and V. J. Brennan and N. J. Kaufman, JJ., affirmed and granted both defendants' motions for peremptory reversal of their convictions (Docket Nos. 26420, 27134). The people appeal. In an opinion by Justice Blair Moody, Jr., joined

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4, 5, 7-10] 21 Am Jur 2d, Criminal Law §§ 166, 191, 192, 394.
[3-5, 8] 21 Am Jur 2d, Criminal Law § 548.
[6] 16 Am Jur 2d, Constitutional Law § 65.
  21 Am Jur 2d, Criminal Law §§ 191, 192.

by Justices Kavanagh, Levin, and Ryan, the Supreme Court *held:*

The interest of the State of Michigan in trying these defendants for murder does not differ substantially from the interest previously addressed in the Federal prosecution. Accordingly, the subsequent trial in circuit court for the same act violated the prohibition of the state Constitution against double jeopardy, and the decision holding that the second trial is prohibited as a matter of state law must be given retroactive effect.

1. The state Constitution limits the state's ability to prosecute a defendant following a Federal conviction of charges arising out of the same acts. Trends in Federal law and the dictates of the Michigan Constitution impose limits on what the principle of dual sovereignty permits. Where a criminal act involves the legitimate interests of both the state and Federal governments and the Federal prosecution cannot adequately represent the state's independent interest, then the state, in those rare instances, is justified in protecting its interest by prosecuting the defendant, even after conviction or acquittal in Federal court. Dual prosecution of the differing interests violates neither the Federal nor Michigan Constitution. There is also a fundamental need to safeguard a defendant's constitutional rights, which is done by prohibiting dual prosecution where the interests of the state are not substantially different. Distinct risks and penalties arise for defendants from the very fact of multiple prosecution, among which are 1) continued embarrassment, expense and ordeal; 2) being compelled to live in a continuing state of anxiety and insecurity; and 3) the possibility that even though innocent they may be found guilty through repeated prosecutions. When weighed against the interest of the state in dual prosecutions, the defendant's right not to be twice tried and convicted prevails, and second prosecutions are prohibited unless the record demonstrates substantially different state interests.

2. The Court's previously announced guidelines for determining whether the interests of the state are significantly different from the interests addressed by the Federal prosecution include: whether the maximum penalties of the statutes involved vary greatly, whether there is some cause to believe that the Federal court cannot adequately vindicate the state interest in obtaining a conviction, and whether the differences in the statutes are merely jurisdictional rather than substantive.

3. The maximum penalty which the Court considered in deciding questions of dual sovereignty is the potential statutory sentence, not the actual sentence imposed. The maximum

penalty under the Federal bank-robbery statute is a single term of life imprisonment. The penalty required under the Michigan first-degree murder statute is mandatory life imprisonment. The two statutes share the same maximum punishment, life imprisonment. The Federal penalty is discretionary; the state penalty is mandatory. However, the test is not whether the penalties are similar, but whether the maximum Federal penalty is substantially different in relation to Michigan's sovereign interest. At the very least, the maximum potential punishment in these cases was in theory the same. In any case, as compared with the sentences possible in the Court's first case finding dual prosecutions violative of double jeopardy, the maximum sentences in these cases cannot be discerned to be substantially different.

4. The minimum sentence and parole differences between the Federal and state penal systems are largely obviated for purposes of the analysis because, although the Michigan statute has no statutory minimum sentence and no provision for parole, there exists the broadest discretionary prerogative in the executive for reprieve, commutation, and pardon. Parole from Federal prison is also a matter of grace rather than an automatic occurrence and lies entirely within the discretion of the Federal parole boards. In other words, there is no certainty that these defendants will be released at the time they become eligible. Therefore the analysis properly concentrates upon the statutory maximum penalties.

5. The prosecutor suggests that the Federal sentence is more closely comparable to the state punishment for second-degree murder than to that for felony-murder, and thus that the state punishment for felony-murder is significantly at variance with the Federal punishment. But the Court has already decided that the mandatory life-discretionary life difference between first- and second-degree murder does not make the potential maximum penalties greatly disparate. In addition, comparing the minimum sentence for second-degree murder in Michigan and for the Federal crime of killing a person during the commission of a robbery makes it immediately apparent that the minimum sentence for the former is potentially less severe than for the latter. It is also apparent that a defendant's possible minimum sentence for second-degree murder is any term of years, and many are placed on probation and so fall far below the ten-year minimum sentence required under the Federal code. In addition, a Federal sentencing court has absolutely no discretion to free defendants until they serve the minimum sentence in prison to be eligible for parole. Thus the

proposition cannot be accepted that the sentence for first-degree murder is greatly disparate from the Federal penalty because the Federal sentence provisions more closely resemble the statutory penalty for second-degree murder than for first-degree murder. The dissimilarity of the sentences does not amount to a great disparity causing the interests of the two sovereign jurisdictions to be at variance. Michigan's public interest may be properly protected.

6. There is no basis to conclude that the Federal court could not adequately satisfy the state interest in obtaining a conviction. The record does not reflect an inability or unwillingness to cooperate between state and Federal officials. The Federal bank-robbery statute is directed primarily at insuring the stability and integrity of Federal banks, but the Federal statute protects and penalizes other interests coordinately. One of those interests is the prevention of the taking of human life during the perpetration of a bank robbery. This interest is clearly the same as the state's interest in maintaining a like penalty for a murder which occurs during the perpetration of a named felony, e.g., robbery. Moreover, the laws of both jurisdictions seek to insure the safety of people and the protection of private property. In addition, the jury considered the same key elements and the same facts. There is no discernible state interest substantially different from those already addressed by the Federal government. Consequently, subsequent trials in this state for the same act would violate the Michigan constitutional prohibition against double jeopardy.

7. The determination that the record in these cases will not support a second prosecution under the double jeopardy case decided while these cases were on appeal requires a decision whether to apply the rule of that case retroactively. The Supreme Court of the United States has come to recognize that the Constitution neither prohibits nor requires giving retrospective effect to decisions on constitutional questions, but has concluded that ordinarily decisions on questions of double jeopardy will be applied retroactively because they deal with non-procedural or substantive rights of a fundamental nature. The rule announced by the Supreme Court of Michigan is substantive in that it expands the Michigan Double Jeopardy Clause to proscribe a dual state prosecution when the interests of the Federal government and the state are not substantially different. When the rule applies, the state has no authority to prosecute a defendant in the first place.

8. Even though the nature of a right is substantive and fundamental, in certain circumstances the element of prior

reliance may outweigh its fundamental nature. The people have relied upon the prior policy allowing dual prosecution in cases similar to this one; however, it must also be recognized that many Federal decisions in recent years demonstrate a growing limitation upon the concept of dual prosecution. A trend has become apparent toward limiting prior decisions while generally extending the application of the Federal Double Jeopardy Clause. Thus, any prior reliance placed upon dual sovereignty must have been recognized as somewhat dubious. In instances where the defendant is in fact and law being twice prosecuted for substantially the same offense, reliance upon the questionable concept of dual sovereignty is outweighed by the limited application of the fundamental guarantee against double jeopardy.

9. The reasons for eliminating further state prosecution include 1) the avoidance of continued embarrassment, expense and ordeal; 2) relief from anxiety and insecurity; and 3) the possibility that even though innocent the defendant may be found guilty through repeated prosecutions. Retrospective application would not affect the first and second of these considerations because the dual trials with their effects upon the defendants have taken place. Retrospective application of the double jeopardy rule is required to assure the fair distribution of a fundamental right, and in these cases does not unacceptably prejudice the administration of justice in this state, because the rule applies only when the interests are not significantly different. The possibility of immunizing defendants from serious state penalties following much less severe Federal penalties will not occur. These defendants seasonably raised the double jeopardy question prior to their state trial, but were denied relief by the Court of Appeals on the basis of an opinion by that Court which was subsequently reversed. Retrospective application of the double jeopardy rule must be afforded to them.

Affirmed.

Justice Williams, joined by Chief Justice Coleman and Justice Fitzgerald, concurred in the holding that the double jeopardy rule applies retroactively to the defendants, but he would hold that the state and Federal interests involved are substantially different and that Federal prosecution alone could therefore not satisfy Michigan's immediate interests. Dual prosecution of the defendants was warranted and the matter should be remanded for reinstatement of the convictions of first-degree murder.

1. The Constitution of Michigan prohibits a second prosecu-

tion for an offense arising out of the same criminal act unless it appears from the record that the interests of the state and the jurisdiction which initially prosecuted are substantially different. When state and Federal interests do coincide, prosecution by one sovereign will satisfy the need of the other. Case-by-case analysis cannot be avoided. The factors to be considered in making the determination may include whether the maximum penalties of the statutes involved are greatly disparate, whether the differences in the statutes are merely jurisdictional or are more substantive, and whether some reason exists why one jurisdiction cannot be entrusted to vindicate fully another jurisdiction's interests in securing a conviction.

2. The maximum penalties in these cases are greatly disparate because the state first-degree murder statute provides a mandatory penalty of life imprisonment without the prospect of parole while the Federal statute more closely resembles the state second-degree murder statute and its sentencing provision. The Federal statute provides a mandatory minimum of ten years, but the maximum sentence, life imprisonment, is entirely discretionary. Further, one convicted under the Federal statute may enjoy early release on parole, while one convicted of first-degree murder under the Michigan statute may obtain release from life imprisonment only through executive clemency, a discretionary relief which is rarely granted. The Federal and state statutes are patently discordant in their sentence provisions.

3. Determining whether the differences in the statutes are merely jurisdictional or are more substantive includes an inquiry whether the statutes differ as to the type of conduct prohibited, the interests sought to be protected, and the proofs required to establish the prohibited offense. The statutes are different in at least two of these three respects. The Federal statute essentially punishes culpability for second-degree murder, while the state first-degree murder statute penalizes a more atrocious offense. The substantive distinction between first- and second-degree murder reflects a radical difference in the law's view of the offender's culpability and in the offender's punishment. The Federal statute is essentially an enactment to protect the property and security of Federal banking institutions, and treats the fact of a killing as an aggravation of the bank robbery augmenting the punishment, whereas the principal purpose of the first-degree murder statute is to protect human life and punish extreme culpability. The state and Federal prosecutions are based on substantively different statutes forwarding different purposes and protecting different

interests. Furthermore, at the time the defendants were tried, the Federal jury was permitted to infer the *mens rea* element of the killing from the evidence presented but the mental element was withdrawn from the state juries' consideration because the defendants' *mens rea* was imputed or implied as a matter of law from the commission of the underlying felony.

4. Primarily because of the substantive differences of the statutes, the Federal jurisdiction was impeded in vindicating fully Michigan's interests in securing convictions of the defendants. Furthermore, even if the United States Attorney had desired to prosecute the defendants for first-degree murder, as did the state prosecuting attorney, that could not have been done in the Federal jurisdiction because the bank teller neither died on a Federal reservation nor was a Federal officer.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL SOVEREIGNTY.

The state is justified in protecting its interest by prosecuting a defendant after his conviction or acquittal in Federal court for the same criminal act in those rare instances where the criminal act involves the legitimate interests of both the state and Federal governments, and the Federal criminal prosecution cannot adequately represent the state's independent interests; dual prosecution of the differing interests violates neither the Federal nor the state Constitution (US Const, Am V; Const 1963, art 1, § 15).

2. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL SOVEREIGNTY.

The state Constitution prohibits dual prosecution by the state and Federal governments for offenses arising out of the same criminal act where the interests of the state are not substantially different from the Federal interests (Const 1963, art 1, § 15).

3. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL SOVEREIGNTY — MAXIMUM SENTENCE.

The maximum penalty under Federal and state law which is to be considered in deciding whether successive Federal and state trials arising out of the same act violate the guarantee against double jeopardy in the state Constitution is the potential statutory sentence, not the actual sentence imposed in the challenged prosecutions; the test is not whether the penalties are similar, but whether the maximum Federal penalty is substan-

tially different in relation to the state's sovereign interest in prosecuting the crime (Const 1963, art 1, § 15).

4. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — FIRST-DEGREE MUR-
   DER — SAME ACTS — DUAL SOVEREIGNTY — MAXIMUM SEN-
   TENCE.

The maximum statutory sentences under Federal and state laws for killing a bank teller during the commission of a bank robbery are not so dissimilar as to amount to a greatly disparate sentence causing the interests of the two sovereign jurisdictions to be at variance under the guarantee against double jeopardy in the Michigan Constitution; therefore, the public interest of Michigan may be properly protected by a Federal prosecution for the same criminal act (Const 1963, art 1, § 15; 18 USC 2113; MCL 750.316; MSA 28.548).

5. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — FIRST-DEGREE MUR-
   DER — SAME ACTS — DUAL SOVEREIGNTY.

Successive trials for killing a bank teller in the course of a robbery under Federal law, and for first-degree murder of the teller under state law, arising out of the same criminal act, violate the guarantee against double jeopardy in the state Constitution because there is no discernible state interest which is substantially different from those already addressed by the Federal government (Const 1963, art 1, § 15; 18 USC 2113; MCL 750.316; MSA 28.548).

6. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL
   SOVEREIGNTY — RETROACTIVITY.

Retrospective application of the rule against successive prosecutions under Federal and state law for the same criminal act must be afforded to defendants who seasonably raised the double jeopardy question before their state trial because the protection of the guarantee against double jeopardy is substantive and fundamental, the state's reliance upon a dubious policy of permitting unlimited dual prosecutions is outweighed by the limited application of the fundamental guarantee against double jeopardy, retrospective application of the rule is necessary to effectuate its purpose, and the administration of justice in the state is not prejudiced by application of the rule, which requires that the state's interest be adequately vindicated by the Federal prosecution (Const 1963, art 1, § 15).

DISSENTING OPINION BY WILLIAMS, J.

See headnotes 1, 2, 4.

7. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL SOVEREIGNTY — SUCCESSIVE PROSECUTIONS.

    *The Double Jeopardy Clause of the Michigan Constitution prohibits a second prosecution for an offense arising out of the same criminal act unless it appears from the record that the interests of the State of Michigan and the jurisdiction which initiated the prosecution are substantially different (Const 1963, art 1, § 15).*

8. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL SOVEREIGNTY — SUCCESSIVE PROSECUTIONS.

    *Successive prosecutions under Federal and state law arising out of the same criminal act violates the Double Jeopardy Clause of the Michigan Constitution where state and Federal interests in prosecuting the defendant coincide; prosecution by one sovereign will satisfy the need of the other (Const 1963, art 1, § 15).*

9. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — SAME ACTS — DUAL SOVEREIGNTY — SUCCESSIVE PROSECUTIONS.

    *The factors to be considered in determining whether a Federal prosecution of a defendant will satisfy the state's interests, thus preventing a second prosecution for an offense arising out of the same criminal act, may include whether the maximum penalties of the Federal and state statutes involved are greatly disparate, whether some reason exists why the Federal jurisdiction cannot be entrusted to vindicate fully the state's interests in securing a conviction, and whether the differences in the statutes are merely jurisdictional or are more substantive (Const 1963, art 1, § 15).*

10. CONSTITUTIONAL LAW — DOUBLE JEOPARDY — FIRST-DEGREE MURDER — SAME ACTS — DUAL SOVEREIGNTY.

    *Successive trials for killing a bank teller in the course of a robbery under Federal law, and for first-degree murder of the teller under state law, arising out of the same criminal act do not violate the guarantee against double jeopardy in the Michigan Constitution because the Federal and state interests involved are substantially different; Federal prosecution alone, therefore, could not satisfy the state's immediate interests (Const 1963, art 1, § 15; 18 USC 2113; MCL 750.316; MSA 28.548).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James J. Gregart,*

Prosecuting Attorney, and *Stephen M. Wheeler,* Chief of Appellate Division, for the people.

*Howard & Howard* for defendant Gay.

*Thomas J. Hirsch* for defendant Gerlofs.

BLAIR MOODY, JR., J. On August 20, 1974, defendants Steven Michael Gay and Donald Lee Gerlofs were charged in the United States District Court for the Western District of Michigan with bank robbery, assault with a dangerous weapon while committing a bank robbery and taking the life of teller Connie Marie Adams while committing a bank robbery. 18 USC 2113(a); 18 USC 2113(d); 18 USC 2113(e).[1] After a joint Federal jury trial which commenced October 14, 1974, defendant Gay was found guilty on all three counts and was sentenced to life imprisonment. Defendant Gerlofs was convicted on the first two counts, but acquitted of killing a teller while committing a robbery.

[1] These sections provide in pertinent part as follows:

"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

"Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, * * * with intent to commit in such bank, credit union, or in such savings and loan association, * * * any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

\* \* \*

"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

"(e) Whoever, in committing any offense defined in this section, * * * kills any person * * * shall be imprisoned not less than ten years, or punished by death * * *." 18 USC 2113.

Concurrently, under Michigan's jurisdiction, defendants were charged in Kalamazoo Circuit Court with murdering Connie Marie Adams during the commission of an armed robbery, contrary to MCL 750.316; MSA 28.548.[2] Following their conviction in Federal court, each defendant moved to dismiss the state prosecution on grounds that trying them on murder charges in Michigan would constitute double jeopardy. The cases were consolidated for purposes of the motion and heard before Circuit Judge Lucien F. Sweet. On December 30, 1974, the motion was denied as to both defendants.

Subsequently, on March 10, 1975, Judge Robert L. Borsos, successor to Judge Sweet, issued an order to stay proceedings pending an interlocutory appeal to the Michigan Court of Appeals, testing the prior denial of defendants' motion to dismiss. On July 7, 1975, the Court of Appeals denied the appeal on the authority of its decision in *People v Cooper,* 58 Mich App 284; 227 NW2d 319 (1975). This Court denied defendants' interlocutory appeal on October 16, 1975. 395 Mich 768 (1975).

Defendant Gay appealed his Federal conviction. The United States Court of Appeals reversed that conviction on the basis of error in the jury selection process. *United States v Gay,* 522 F2d 429 (CA 6, 1975). Shortly afterward, defendant Gay pled guilty in Federal District Court to the three charges on which he had been convicted originally and was sentenced to 99 years imprisonment. Defendant Gerlofs has not appealed his Federal conviction.

---

[2] This statute provides:

"All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping, shall be murder of the first degree, and shall be punished by solitary confinement at hard labor in the state prison for life." MCL 750.316; MSA 28.548.

Defendants were separately tried in state court on the murder charges. Defendant Gerlofs was convicted by jury on August 7, 1975. Defendant Gay was similarly convicted on October 15, 1975. They were both sentenced to life imprisonment.

Both defendants appealed their convictions to the Michigan Court of Appeals. Subsequent to filing appeal but prior to decision, this Court issued its opinion in *People v Cooper,* 398 Mich 450; 247 NW2d 866 (1976). Consequently, on June 16, 1977, pursuant to defendant Gerlofs' motion for peremptory reversal, the Court of Appeals remanded that case to circuit court for reconsideration of an alleged double jeopardy violation in light of *Cooper.*

On remand, Judge Borsos found that defendant Gerlofs had been twice placed in jeopardy and therefore dismissed his state conviction of murder. The Court of Appeals affirmed in an order issued on December 7, 1977, granting defendant's original motion for peremptory reversal. A similar order was entered as to defendant Gay on January 6, 1978. The prosecutor applied to this Court for leave to appeal, and leave was granted as to both defendants. 402 Mich 939-940 (1978).

We granted leave to resolve two questions: (1) whether, under the guidelines established by this Court's decision in *People v Cooper,* the prosecution of defendants in a Michigan court subsequent to their conviction in Federal court for the same act violates Const 1963, art 1, § 15, placing them twice in jeopardy; and (2) whether this Court's decision in *People v Cooper* must be applied retroactively.

We hold that the interest of the State of Michigan in trying these defendants for murder does not differ substantially from the interest previously

addressed in defendants' Federal prosecution. Accordingly, we find that subsequent trial in this state for the same act violated the Michigan constitutional prohibition against double jeopardy. We also hold that this Court's decision in *People v Cooper* must be accorded retroactive effect.

I

This Court broke with Federal precedent and held in *People v Cooper* that limitations did exist under the Michigan Constitution upon the state's ability to prosecute a defendant in a state court following a conviction in Federal court for crimes arising out of the same acts. 398 Mich 457, 460-461. We recognized in *Cooper* that state criminal justice systems must retain their strength and independence. This principle of dual sovereignty has long maintained ascendance in the American system of justice. In fact, the Federal precedent established prior to our decision in *Cooper* largely bases its authorization for dual prosecution on this principle. See *Bartkus v Illinois,* 359 US 121; 79 S Ct 676; 3 L Ed 2d 684 (1959); *Abbate v United States,* 359 US 187; 79 S Ct 666; 3 L Ed 2d 729 (1959).

However, we found that emerging Federal trends in recent years and the dictates of our own Constitution required us to impose limits on what dual sovereignty would permit. We held that where a criminal act involves the legitimate interests of both the state and Federal governments and the Federal criminal prosecution cannot adequately represent the state's independent interests, then the state in those rare instances is justified in protecting its interest by prosecuting the defendant, even after conviction or acquittal in Federal court. 398 Mich 459-460. Dual prosecution

of these differing interests violates neither the Federal nor Michigan Constitution. See US Const, Am V; Const 1963, art 1, § 15. See also *Bartkus v Illinois, supra,* 137.

On the other hand, this Court also recognized the fundamental need to safeguard defendants' constitutional rights. We therefore prohibited dual prosecution where the interests of the state are not "substantially different". *People v Cooper, supra,* 461. Distinct risks and penalties arise for defendants from the very fact of multiple prosecution, among which are (1) continued embarrassment, expense and ordeal; (2) being compelled to live in a continuing state of anxiety and insecurity; and (3) the possibility that even though innocent they may be found guilty through repeated prosecutions. See *United States v Wilson,* 420 US 332, 343; 95 S Ct 1013; 43 L Ed 2d 232 (1975); *Green v United States,* 355 US 184, 187-188; 78 S Ct 221; 2 L Ed 2d 199 (1957).

When weighed against the interest of the state in dual prosecutions, we concluded that the defendant's right not to be twice tried and convicted prevailed and that second prosecutions were prohibited unless the record demonstrated substantially different state interests. *People v Cooper, supra,* 461. See also *Commonwealth v Mills,* 447 Pa 163; 286 A2d 638 (1971); *State v Hogg,* 118 NH 262; 385 A2d 844 (1978). We rested our decision on Const 1963, art 1, § 15. See *People v Beavers,* 393 Mich 554, 567-568; 227 NW2d 511 (1975).

*Cooper* represents a strong and uncompromising statement by this Court that a defendant's right not to be twice tried in Federal and state court for the same criminal act will be jealously guarded except in extreme cases where Federal laws are framed to protect substantially different social

interests. 398 Mich 459. *Cooper* makes clear that
as a firm rule dual prosecution ordinarily will not
be tolerated in Michigan. It is only in the rare
instance where the social interests of the state are
not addressed in substance by the Federal statute
that a second prosecution will be allowed. Further,
since this safeguard of defendant's right against
double jeopardy is of a constitutional magnitude, it
must receive this Court's close consideration. It is
thus within this context that our Court determines
whether a possible second prosecution may be
allowed.

*Cooper* accounts for rare exceptions to the rule
by suggesting certain conditions for the limited
instances when such prosecution will be allowed.
These guidelines are "nonexclusive" in the sense
that other factors militating against dual prosecu-
tion and in favor of protecting defendant's consti-
tutional right may be considered. See *People v
Formicola,* 407 Mich 293, 298; 284 NW2d 334
(1979). The guidelines stated in *Cooper* include
whether the maximum penalties of the statutes
involved vary greatly, whether some cause exists
to believe the Federal court cannot adequately
vindicate the state interest in obtaining a convic-
tion, and whether the differences in the statutes
are merely jurisdictional rather than substantive.
*People v Cooper, supra,* 461.

The first factor suggested is "whether the maxi-
mum penalties of the statutes involved are greatly
disparate". The "maximum penalty" which this
Court considers in relation to allowing dual prose-
cution is the potential statutory sentence, not the
actual sentence assessed. What we compare in this
case is the maximum possible sentence in Federal
court for killing during a bank robbery as against
the maximum possible sentence in Michigan for

murder during an armed robbery. The potential maximum sentences are the focus of any inquiry.

To discern what was meant by this first factor, an analysis of the maximum penalties involved in *Cooper* is enlightening. In *Cooper,* the defendant was acquitted in Federal court under the Federal bank robbery statute. 18 USC 2113(a). Before the Michigan Supreme Court he stood convicted of bank robbery, MCL 750.531; MSA 28.799, and assault with intent to rob being armed, MCL 750.89; MSA 28.284. The Federal maximum penalty provided that a defendant upon conviction shall be "fined not more than $5,000 or imprisoned not more than twenty years, or both". On the other hand, the maximum Michigan penalty for bank robbery and for the assault conviction each provided for imprisonment in the state penitentiary for life or any term of years.

Accordingly, in *Cooper,* the disparity between the maximum penalties possible under the Federal and Michigan statutes involved the difference between a $5,000 fine and 20 years in prison as opposed to two concurrent sentences of life imprisonment. On its face, the distinction is most apparent. The potential Federal maximum is markedly less severe than its Michigan counterpart. Yet, the Court found that such varied sentences did not constitute penalties that were "greatly disparate" for purposes of allowing dual prosecution of the defendant in Michigan. 398 Mich 462.

Comparing the instant case, defendants both were accused in Federal court of taking the life of teller Connie Marie Adams while committing a bank robbery. In Michigan, authorities brought a single charge of felony murder. The maximum penalty under the Federal statute is a single term

of life imprisonment.[3] See *United States v Atkins,*
558 F2d 133, 137 (CA 3, 1977), *United States v
Faleafine,* 492 F2d 18, 24-25 (CA 9, 1974). The
penalty required under the Michigan statute is
mandatory life imprisonment. Thus the two stat-
utes facially share the same maximum potential
punishment—life imprisonment. The Federal pen-
alty is discretionary; the state penalty is manda-
tory. However, as *Cooper* clearly specifies, the test
is not whether the penalties are similar, but
whether the maximum Federal penalty is substan-
tially different in relation to Michigan's sovereign
interest. 398 Mich 459, 461. See also, *Turley v
Wyrick,* 554 F2d 840, 844 (CA 8, 1977) (Lay, J.,
concurring).

Consequently, in relation to the maximum pen-
alties possible in *Cooper,* the potential maximum
penalties involved in the present case are much
less disparate as perceived in regard to the protec-
tion of Michigan's penological interest. At the very
least, the potential maximum punishment in these
cases was in theory the same. In any case, as
compared with *Cooper,* the maximum sentences in
the instant cases cannot be discerned to be sub-
stantially different.

The prosecutor raises the argument that the
Federal and state sentences vary in their provision
for minimum prison terms served. It is urged that
such an alleged variance constitutes a substantial
difference under *Cooper.* The argument is prem-
ised upon the fact that under a Federal conviction
for killing during the commission of a bank rob-
bery the statute provides for a minimum sentence

---

[3] Under a 1934 amendment, the Federal bank-robbery statute pro-
vided for death. 18 USC 2113(e). That provision was declared uncon-
stitutional for reasons unrelated to the propriety of the death penalty
itself. See *Pope v United States,* 392 US 651; 88 S Ct 2145; 20 L Ed 2d
1317 (1968).

of ten years. No such minimum sentence is permitted under the applicable murder statute in Michigan.[4] Conjoined with this argument is the further provision under Federal statutes that allows early release on parole upon proper application to Federal authorities.[5] In contrast, Michigan statutes do not provide for parole in cases of murder committed during an armed robbery.

The analysis in *Cooper* centers upon the maximum sentences. The validity of this focus becomes apparent when attempting to make a comparative evaluation of potential minimum sentences and release requirements.

The minimum sentence and parole differences between the Federal and state penological systems are largely absorbed for purposes of analysis under *Cooper* by the fact that similar discretion for early release does exist in Michigan. Specifically, while under the Michigan penalty there exists no statutory minimum sentence for the court to impose and no executive provision for parole, there exists the broadest discretionary prerogative in the executive for reprieve, commutation and pardon.[6]

---

[4] In its opinion on remand relative to defendant Gerlofs, the trial court made the following comment concerning the prosecutor's argument:

"In Michigan, felony-murder is punished with a mandatory life sentence, and although the Federal statute allows a minimum sentence of ten years, it also provides for a maximum sentence of life in prison. Thus, while the Federal court may be more lenient, it is fully capable of being as harsh."

What the trial court highlights here is that the secondary difference in minimum sentence is in practical terms offset for purposes of analysis under *Cooper* by the much more significant fact that the maximum sentences are in essence the same. The Federal court can be as severe in its maximum punishment of life imprisonment as the state in this case.

[5] See, regarding these defendants, 18 USC 4202, repealed and replaced by the non-retrospective amendment embodied in 18 USC 4205.

[6] For distinctions and definitions relative to these functions, see 67A CJS, Pardon and Parole, §§ 3, 4, pp 5-8. This power issues under both

In the instant cases, the Governor's power to commute sentences would most likely apply. See 67A CJS, Pardon and Parole, §§ 32-38, pp 40-53. As regards the Governor's action, there is no statutory minimum sentence. Under this power, there exists a potential discretion for early termination of imprisonment in Michigan as is present in the Federal system of minimum sentence and parole. The question of difference is not one of kind, but of degree and allocation of responsibility. Michigan provides discretion to limit sentences for murder committed during a robbery, but, instead of reposing that discretion in the trial court or parole board, this state places the responsibility in the parole board and chief executive.[7]

It is worthy of note that parole from Federal prison is in no way an automatic occurrence. Parole is a mere matter of grace and lies entirely within the discretion of the Federal parole boards. 18 USC 4203, 18 USC 4208. See *DeCosta v United States Dist Court, Dist of Minnesota,* 445 F Supp 989, 991 (D Minn, 1978). *United States v Freder-*

---

the Constitution and statutes of this state. Const 1963, art 5, § 14; MCL 791.244; MSA 28.2314.

[7] Though limited to the years in which such information was available, our research discloses the following statistics regarding actual commutations as opposed to the number of convictions for *all* first-degree murder convictions for the following years:

| Year | Number of Convictions | Number of Commutations |
|------|----------------------|------------------------|
| 1964 | 8  | 13  |
| 1965 | 14 | .16 |
| 1966 | 7  | 15  |
| 1967 | 30 | 23  |
| 1968 | 38 | 16  |
| 1969 | 28 | 13  |
| 1970 | 41 | 10  |

It is thus readily apparent that when the power to commute was exercised during these particular years by the chief executive, the number of commutations actually compared well to the number of convictions.

*ick,* 405 F2d 129, 133 (CA 3, 1968); *Williams v Patterson,* 389 F2d 374, 375 (CA 10, 1968). A prisoner will not be paroled if there exists a substantial risk that the person will not conform to reasonable parole conditions or that release at an early date would depreciate the seriousness of the offense or promote disrespect for the law. See 67A CJS, Pardon and Parole, § 47, p 71. In other words, there is no certainty that defendants in the instant cases will be released[8] at the point they become eligible.

Thus, in light of the risk of double jeopardy, *Cooper* properly concentrates upon the framework of the statutory maximum penalties. For instance, it would be an impossible and unjust task for courts to speculate about whether the sentence of a particular defendant will actually be commuted by the parole board and Governor in determining whether a second trial and punishment for the same criminal act can be assessed.

As another assertion, the prosecutor suggests that the subject Federal statutory punishment more readily comports with the state second-degree murder penalty. MCL 750.317; MSA 28.549. Thus, it is urged that the potential state sentence for felony murder is thereby significantly variant from the Federal penalty. To be sure, comparing the Federal penalty with the state second-degree

---

[8] In comparing the commutable prison term in Michigan with the parolable term in the Federal system, parole is hardly a full release from sentence or a form of leniency. See 67A CJS, Pardon and Parole, § 39, p 54. A paroled prisoner is released from formal incarceration, but remains under careful supervision and subject to immediate revocation of parole for any infraction of parole conditions. *DeCosta v United States Dist Court, Dist of Minnesota,* 445 F Supp 989, 991 (D Minn, 1978); *Roach v Board of Pardons & Paroles, Arkansas,* 503 F2d 1367, 1368 (CA 8, 1974); *United States v Richardson,* 483 F2d 516, 519 (CA 8, 1973). These conditions apply during the balance of the parolee's sentence. *Morrissey v Brewer,* 408 US 471, 477; 92 S Ct 2593; 33 L Ed 2d 484 (1972).

murder punishment, the potential maximum sentences of life imprisonment are the same. However, it should not be overlooked that the potential maximum sentences in Michigan for first- and second-degree murder are facially the same—life imprisonment. We have resolved that the mandatory life—discretionary life difference does not make the potential maximum penalties "greatly disparate" under *Cooper.*

In addition, comparing the minimum sentence for second-degree murder in Michigan and the Federal crime of killing during the commission of a bank robbery, it is immediately apparent that the minimum sentence in Michigan for second-degree murder is potentially less severe than that for the Federal crime.

As was pointed out in *People v Allen:*

"[P]ersons convicted of second-degree murder may be sentenced to life imprisonment—parolable after ten years imprisonment—but, in the discretion of the sentencing judge, they may be sentenced to any term of years, and many are placed on probation." *People v Allen,* 39 Mich App 483, 502; 197 NW2d 874 (1972) (LEVIN, J., dissenting), *rev'd on other grounds,* 390 Mich 383; 212 NW2d 21 (1973) (adopting dissent of LEVIN, J.).

The obvious distinction appearing from this passage in *Allen* is that defendant's possible minimum sentence for second-degree murder is any term of years and so may fall far below the ten-year minimum sentence required under the Federal code. In addition, a Federal sentencing court has absolutely no discretion to free defendants until they serve the minimum parolable sentence in prison.

Thus, we cannot accept the proposition that the state felony murder sentence is greatly disparate

from the Federal penalty because the Federal sentence provisions are more akin to the state second-degree murder penalty. Ultimately, the actual life sentence to be served by a defendant under the two state statutes and the Federal code is within the discretion of designated officials depending upon the merits of the case.

The intent of the *Cooper* analysis is to focus upon and isolate differences in maximum sentences between the state and Federal jurisdictions. This is intended to demonstrate whether Michigan's interest in protecting its citizens safety may be adequately acquitted by the Federal criminal trial. In the present case, it has been demonstrated that the maximum sentences for a killing which occurred during the commission of a bank robbery do not substantially differ as between the Federal penalties provided and their Michigan counterparts. The dissimilarity between mandatory life and discretionary life does not amount to a "greatly disparate" sentence causing the interests of the two sovereign jurisdictions to be at variance. Michigan's public interest may be properly protected.

As for the second *Cooper* criterion, there is no basis on which to conclude that the Federal court could not adequately satisfy the state interest in obtaining a conviction. The record nowhere reflects an inability or unwillingness to cooperate between state and Federal criminal justice officials. As succinctly stated by the learned trial judge in Gerlofs' case:

"The only way in which Michigan's interests might not have been vindicated is if the Federal trial had not afforded the U.S. attorney a fair chance of conviction. In that case, this Court believes that the state might not be bound by an acquittal from that trial. But, there

is no evidence before the court to indicate that. * * *
This Court has no reason to doubt that Michigan's
interests in a conviction were vigorously, competently
and swiftly pursued by Federal authorities in Federal
court * * *."

In fact, the Federal investigation and prosecu-
tion of the case was obviously a superior effort,
given the fact that much of the evidence later
introduced in the state trial was the result of the
original FBI investigation and Federal trial prepa-
ration. The Federal trial of these defendants actu-
ally served as a "dry run" for the state prosecu-
tion.

Finally, the prosecutor urges that there is a
substantive difference in the purposes of the Fed-
eral and state statutes under the third *Cooper*
criterion.[9] It is suggested that the Federal bank-
robbery statute is directed primarily to insure the
stability and integrity of Federal banks. See *Way v
United States,* 268 F2d 785-786 (CA 10, 1959).
However, the Federal statute protects and penal-
izes other interests coordinately. One of those
interests is preventing the taking of human life
during the perpetration of a bank robbery. This
interest is clearly the same as Michigan's interest
in maintaining a like penalty for a murder which
occurs during the perpetration of a named felony,
*e.g.,* robbery. See MCL 750.316; MSA 28.548. Sepa-
rating the "interests" as the people suggest is not
a reasonable distinction. Further, were we to rec-
ognize that the Federal and state interests differed

---

[9] Both Federal and state statutes involve an offense and sentence
provision concerning homicide. 18 USC 2113(e); MSA 750.316; MSA
28.548. The conviction and sentence to life in prison in both jurisdic-
tions is possible only when the criminal taking of life is proven by the
Federal or state prosecutions. Simply because the Federal killing
provision is incident to the bank-robbery statute makes it no less a
homicide offense and penalty when compared to the offenses present
in *Cooper.*

here, the difference would not be substantial under *Cooper.* 398 Mich 461.

It cannot be ignored that the laws of both jurisdictions seek to insure the safety of individuals and the protection of private property. *People v Cooper, supra,* 462. In addition, the jury considered the same key elements and the same facts. We, therefore, cannot discern a state interest substantially different from those already addressed by the Federal government. Consequently, subsequent trials in this state for the same act would violate the Michigan constitutional prohibition against double jeopardy.

## II

Having determined that the record in this case will not support a second prosecution under the guidelines established by *People v Cooper,* we must now decide whether that decision must be applied retroactively.

Historically, under the Federal system, decisions involving constitutional questions were invariably accorded retroactive effect. *Norton v Shelby County,* 118 US 425; 6 S Ct 1121; 30 L Ed 178 (1886). These decisions proceeded under the theory that the unconstitutional rule was "inoperative as though it had never been passed". 118 US 442. As time progressed, the Federal courts began to recognize limited exceptions to the effect that judicial modification of prior interpretation should be given only prospective effect as to some parties under particular circumstances. See, *e.g., Chicot County Drainage Dist v Baxter State Bank,* 308 US 371, 374; 60 S Ct 317; 84 L Ed 329 (1940). What eventually emerged in Federal law was the recognition that the Constitution "neither prohibits nor requires retrospective effect". *Linkletter v Walker,*

381 US 618, 629; 85 S Ct 1731; 14 L Ed 2d 601 (1965).

In determining whether to apply a rule retroactively or prospectively, the Court in *Linkletter* specifically articulated factors previously alluded to in *Chicot County Drainage Dist,* including the prior history of the rule in question; its purpose and effect; and whether retrospective application will further or retard its operation. *Id.* See also *Tehan v United States ex rel Shott,* 382 US 406; 86 S Ct 459; 15 L Ed 2d 453 (1966); *Desist v United States,* 394 US 244; 89 S Ct 1030; 22 L Ed 2d 248 (1969).

This Court adopted the *Linkletter* approach in *People v Hampton,* 384 Mich 669; 187 NW2d 404 (1971). See also *People v Kamin,* 405 Mich 482; 275 NW2d 777 (1979). In *Hampton* the "key factors" to be taken into account were: (1) the purpose of the new rule; (2) the reliance on the old rule; and (3) the effect on the administration of justice. 384 Mich 674. As basic guidelines to assist in the resolution of whether a new judicial pronouncement should have fully retroactive, partially retroactive, or only prospective effect, these factors are germane and should be applied where appropriate.

However, the United States Supreme Court has since determined that the question whether a *double jeopardy* holding should be given retroactive effect is "not readily susceptible of analysis under the *Linkletter* line of cases". *Robinson v Neil,* 409 US 505, 508; 93 S Ct 876; 35 L Ed 2d 29 (1973). The Court reasoned in *Robinson* that the *Linkletter* cases "dealt with those constitutional interpretations bearing on the use of evidence or on a particular mode of trial. Those procedural rights and methods of conducting trials, however, do not encompass all of the rights found in the

first eight Amendments. Guarantees that do not relate to these procedural rules cannot, for retroactivity purposes, be lumped conveniently together in terms of analysis". *Id.,* 409 US 508.

The Court then stated in *Robinson:*

"The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. * * * [I]ts practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial." *Robinson v Neil, supra,* 509.

See, *e.g., Linkletter v Walker, supra; Johnson v New Jersey,* 384 US 719; 86 S Ct 1772; 16 L Ed 2d 882 (1966). See also *People v Kamin, supra.*[10]

Thus, when faced with the retroactivity question, we recognize that an analytical distinction has evolved. When considering procedural rules governing trial conduct, the *Linkletter-Hampton* criteria play a predominant role. However, when non-procedural or substantive rights of a fundamental nature are affected, they are normally to be accorded retrospective application. The *Linkletter-Hampton* considerations may be addressed, but only in the rare instance will they have determinative effect. Accordingly, the United States Supreme Court has concluded that ordinarily its

[10] In *Kamin,* where this Court held retroactive rules concerning lesser included offense instructions announced in *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975), the Court disagreed regarding how the defendant's interest ought to be characterized. Some of the members of the Court found the defendant's right to lesser included offense instructions substantive in nature while others found the right a procedural question. *People v Kamin,* 405 Mich 482, 494-495; 275 NW2d 777 (1979). But see *id.,* 505-507 (BLAIR MOODY, JR., J., dissenting). Whether *Cooper* announced a new substantive rule of law is not a serious subject of dispute in this case.

double jeopardy decisions will be applied retroactively. *Robinson v Neil, supra.*

The holding in *Cooper* is substantive in that it expands the Michigan Double Jeopardy Clause to proscribe a dual state prosecution when the interest of the Federal government and the state are not "substantially different". When *Cooper* applies, the state has no authority to prosecute a defendant in the first place. Our Court recognized the fundamental nature of this constitutional right when in *Cooper* we stated:

"In *Benton v Maryland* [395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969)], the [United States Supreme] Court declared the Fifth Amendment guarantee against double jeopardy to be a fundamental right which was applicable to the states through the due process clause of the Fourteenth Amendment." *People v Cooper, supra,* 457.

Although the nature of the right is substantive and fundamental, the factors outlined in *Linkletter* should not be totally ignored. The United States Supreme Court in *Robinson* suggested that the distinction that was drawn is not an ironclad one and particularly noted that in certain circumstances the element of prior reliance may outweigh the fundamental nature of the right involved. *Robinson v Neil, supra,* 509.

We realize that the people have relied upon the prior policy allowing dual prosecution in similar instances. However, it must also be recognized that many of the decisions of the United States Supreme Court in recent years demonstrate a growing limitation upon the concept of dual prosecution originally approved by *Bartkus* and *Abbate.* See, *e.g., Elkins v United States,* 364 US 206; 80 S Ct 1437; 4 L Ed 2d 1669 (1960); *Murphy v Water-*

*front Comm of New York Harbor,* 378 US 52; 84 S
Ct 1594; 12 L Ed 2d 678 (1964); *Waller v Florida,*
397 US 387; 90 S Ct 1184; 25 L Ed 2d 435 (1970);
*Robinson v Neil, supra.* A trend has become appar-
ent toward limiting the impact of decisions like
*Bartkus* while generally extending the application
of the Federal Double Jeopardy Clause. See, *e.g.,*
*North Carolina v Pearce,* 395 US 711; 89 S Ct
2072; 23 L Ed 2d 656 (1969); *Waller v Florida,*
*supra; Ashe v Swenson,* 397 US 436; 90 S Ct 1189;
25 L Ed 2d 469 (1970); *Brown v Ohio,* 432 US 161;
97 S Ct 2221; 53 L Ed 2d 187 (1977); *Harris v
Oklahoma,* 433 US 682; 97 S Ct 2912; 53 L Ed 2d
1054 (1977). Thus, any prior reliance placed upon
the dual sovereignty concept must have been rec-
ognized as somewhat dubious.

Furthermore, we are also cognizant that dual
prosecution is only proscribed by *Cooper* when the
penalties do not vary greatly, the state interest
can be adequately vindicated in the Federal court,
and there is no significant substantive difference
between the statutes. In other words, it must
clearly appear that the defendant is in fact and
law being twice prosecuted for substantially the
same offense. In such instances, reliance upon the
questionable concept of dual sovereignty is out-
weighed by the limited application of the funda-
mental right against double jeopardy.

Another of the factors outlined in *Linkletter-
Hampton* requires us to consider the purpose of
the *Cooper* ruling in relation to possible retrospec-
tive effect. The reasons expressed in *Cooper* for
eliminating further state prosecution include (1)
the avoidance of continued embarrassment, ex-
pense and ordeal; (2) relief from anxiety and inse-
curity; and (3) the possibility that even though
innocent the defendant may be found guilty

through repeated prosecutions. *People v Cooper,*
*supra,* 460. It is apparent that retrospective appli-
cation would not affect the first and second of
these considerations as the dual trials with their
impact upon the person are now history. However,
it is equally clear that retrospective application of
the *Cooper* rule is required to assure the fair
distribution of a fundamental right.

Finally, we are not persuaded that retrospective
application of *Cooper* in these cases unacceptably
prejudices the administration of justice in this
state. Because the *Cooper* rule applies only when
the interests are not significantly different, the
possible prejudice mentioned in *Robinson* of immu-
nizing defendants from serious state penalties fol-
lowing much less severe Federal penalties simply
will not occur. *Robinson v Neil, supra,* 409 US 510.
Where the penalties are greatly disparate, where
the state interest cannot be adequately vindicated,
or where the statutes vary substantively, dual
prosecution is permissible to protect state inter-
ests. *People v Cooper, supra,* 459, 461.

We note that the Pennsylvania Supreme Court
held *Commonwealth v Mills, supra,* the case upon
which the general approach of *People v Cooper*
was modeled, to have retrospective application in
that state. See *Commonwealth v Saunders,* 456 Pa
406; 322 A2d 102 (1974). We further recognize that
these defendants seasonally raised the double
jeopardy question prior to their state trial, but
were denied relief by the Court of Appeals on the
basis of that Court's opinion in *People v Cooper,*
which was subsequently reversed by this Court.

In conclusion, we find that the purpose embodied
in the *Cooper* decision—the protection of defen-
dants' right against double jeopardy—is substan-
tive and fundamental. In such case, retrospective

effect is ordinarily recognized. Moreover, reliance upon a dubious policy of permitting unlimited dual prosecutions is outweighed by the limited application of this fundamental right against double jeopardy. Retrospective application is necessary to effectuate the purpose of the rule and would not prejudice the administration of justice in this state. Thus, we conclude that retrospective application of *Cooper* in these cases must be afforded.

In these cases, Gay received a 99-year sentence on his Federal guilty plea conviction. Gerlofs received a less severe sentence, but did so apparently because he was acquitted[11] of the charge of killing a teller while robbing the bank.

We abhor the senseless taking of the life of Connie Marie Adams which occurred while these defendants robbed the Industrial State Bank in Augusta, Michigan. This act was a terrible and reprehensible crime. We have carefully evaluated every aspect of these cases. Yet, the defendants were tried and punished in the same community where the crime occurred, by and before people who lived in that community and under a Federal statute whose provisions and procedures are substantially the same as our state law. The people and the defendants had their day in court when the defendants were prosecuted for the Federal crimes. We are constrained to hold continued prosecution under these circumstances is limited by the Double Jeopardy Clause of our Constitution.

We therefore hold that under *People v Cooper, supra,* the prosecution of defendants in a Michigan court subsequent to their convictions in Federal

---

[11] Under other state authorities, an acquittal in Federal court is not distinguished from a conviction in Federal court when dealing with a potential dual prosecution for the same criminal act. See *State v Fletcher,* 22 Ohio App 2d 83, 85, fn 5; 259 NE2d 146 (1970); *Commonwealth v Studebaker,* 240 Pa Super 37, 49, fn 24; 362 A2d 336 (1976).

court for the same acts places the defendants twice in jeopardy and that the *Cooper* decision does have retrospective application to these cases.

The orders of the Court of Appeals are affirmed.

KAVANAGH, LEVIN, and RYAN, JJ., concurred with BLAIR MOODY, JR., J.

WILLIAMS, J. *(for reversal).* This case concerns whether application of the former jeopardy doctrine enunciated in *People v Cooper,* 398 Mich 450; 247 NW2d 866 (1976), will permit successive prosecutions under the federal bank-robbery statute, 18 USC 2113(e), and the Michigan first-degree felony-murder statute, MCL 750.316; MSA 28.548, for the death of a bank teller during a robbery. Under the facts of this case, we find that the state and federal interests are "substantially different" and that federal prosecution alone could therefore not satisfy the state's immediate interests, *Cooper, supra,* 461; accordingly, we must conclude that dual prosecution was warranted. The instant appeal presents state and federal statutory maximum penalties which are "greatly disparate". *Id.,* 461. Further, the "differences in [those] statutes are [not] merely jurisdictional [but] are more substantive"; consequently, "some reason exists why one jurisdiction cannot be entrusted to vindicate fully another jurisdiction's interests in securing a conviction". *Id.,* 461. For these reasons, we reverse the Court of Appeals reversal of defendants' state first-degree felony-murder convictions and remand this matter for their reinstatement. We concur in our Brother MOODY's holding that the double jeopardy rule enunciated in *Cooper* should be applied retroactively to the instant matter.

## I. Facts

### A. Introduction

On August 19, 1974, defendants set out on a shocking course which was to conclude that same day in the tragic killing of bank teller Connie Marie Adams.

Armed with two shotguns purchased by defendant Gerlofs, defendants initially sought to rob a restaurant in Kalamazoo, Michigan. Disappointed that the restaurant's manager was absent, defendants proceeded to the Industrial State Bank and Trust Company located in Augusta, Michigan. As stated by defendant Gerlofs: "We decided that we should rob something and get a lot of money. We agreed on the bank in Augusta."

While defendant Gay entered the bank armed with a loaded shotgun earlier purchased by his companion, defendant Gerlofs remained in the driver's seat of their automobile parked in front of the bank. Upon entering, defendant Gay approached Connie Marie Adams' teller's window and requested that she "put the money in the bag". Apparently frightened by defendant Gay's startling demand, Ms. Adams remained still. Defendant Gay again repeated this request, rapping the shotgun on the glass partition of Ms. Adams' enclosure. At this point, the shotgun discharged, killing Ms. Adams. Defendant Gay immediately left the bank, taking with him monies secured from another teller's counter; the total sum removed was approximately $6,000 which defendants later divided. Defendants fled, with defendant Gerlofs driving.

### B. The Federal Trial and Appeal

Both defendants were subsequently arrested by FBI officers in Oklahoma on August 21, 1974, arraigned before a federal magistrate in Oklahoma

on the following day, and finally returned to Grand Rapids, Michigan, for incarceration on August 24, 1974.

On August 28, 1974, both defendants were returned to Kalamazoo for arraignment in the state district court on first-degree felony-murder charges, MCL 750.316; MSA 28.548. Thereafter, defendants were returned to federal custody.

Commencing on October 14, 1974, defendants were jointly tried in the United States District Court for the Western District of Michigan on charges of bank robbery, 18 USC 2113(a), assault with a dangerous weapon while committing a bank robbery, 18 USC 2113(d), and killing a person while committing a bank robbery, 18 USC 2113(e). These sections provide in pertinent part as follows:

"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

"Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, * * * with intent to commit in such bank, credit union, or in such savings and loan association, * * * any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

\* \* \*

"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

"(e) Whoever, in committing any offense defined in this section, * * * kills any person * * * shall be imprisoned not less than ten years * * *."

Both defendants were found guilty in federal court of bank robbery and assault with a dangerous weapon while committing a bank robbery. For the purposes of sentencing, these two counts were merged and defendant Gay was sentenced to a concurrent life sentence with the possibility of parole after 15 years, 18 USC 4202.[1] These counts were likewise merged as to defendant Gerlofs who was sentenced to ten years imprisonment with "eligibil[ity] for parole at such time as the board of parole may determine", 18 USC 4208(a)(2).[2]

With respect to the charge of killing Ms. Adams during the commission of a bank robbery, the federal jury was instructed as follows:

"Count 3 charges that on or about the 19th day of August, 1974, at Augusta, Michigan, Donald Lee Gerlofs and Steven Michael Gay, in committing the robbery charged in Count I, killed Connie Marie Adams, in violation of the laws of the United States.

"The statute in this case provides as follows: 'Whoever, in committing a bank robbery, kills any person, shall be guilty of an offense against the United States.'

"Three elements are required to be proved to establish the offense charged in Count 3 of the indictment:

"First, the act of killing a person.

"Second, doing such act with intent at the time of the

[1] 18 USC 4202 was repealed and reenacted with modification by 18 USC 4205 on March 15, 1976. Subsection (a) of 18 USC 4205 now provides for parole eligibility after a prisoner has served 10, rather than 15, years of a life sentence.

[2] If the federal judge had not specifically provided for parole eligibility pursuant to 18 USC 4208(a)(2), defendant Gerlofs would have been eligible for parole under the terms of 18 USC 4202 only after serving one-third of his ten-year sentence. 18 USC 4208(a)(2) was subsequently repealed and reenacted with modification by 18 USC 4205(b)(2) on March 15, 1976.

killing to willfully take the life of the person, or an intent willfully to act callously and with wanton disregard of the consequences of human life; but there does not necessarily need to be any ill will, spite, or hatred towards the individual killed.

"Third, doing such act in the commission of the offense charged in Count 1.

* * *

"With regard to the element of intent, you may consider all the facts and circumstances in the case. If you so find that the defendant Gerlofs had a 12-gauge shotgun, and that he had purchased the shotgun the night before, as well as ammunition; that defendant Gay had the 20-gauge shotgun, and also whether or not each of the participants so armed—that the defendant Gerlofs had a 12-gauge shotgun, and the defendant Gay had a 20-gauge shotgun, and were so armed during the execution of their original intent, if you so find, to rob the bank.

"Under these circumstances, and also considering all the facts and circumstances which you find to be true, you may reach the judgment that Gerlofs' participation may have been such as to find him guilty as an aider and abettor to the killing."

Defendant Gerlofs was acquitted of this federal charge. Defendant Gay, however, was convicted of killing Connie Marie Adams during the commission of a bank robbery. For the purposes of sentencing, this count was merged with the robbery and assault counts and defendant Gay was sentenced to serve a concurrent life sentence, again with the possibility of parole after 15 years, 18 USC 4202.

Defendant Gerlofs did not appeal his federal convictions. On appeal to the United States Sixth Circuit Court of Appeals, however, defendant Gay's convictions were reversed for error in the jury selection process, *United States v Gay,* 522 F2d 429 (CA 6, 1975). On September 25, 1975,

defendant entered a plea of guilty in federal court to the three counts on which he had been originally tried. For the purposes of sentencing, the three counts were merged and defendant was sentenced to concurrent 99 years imprisonment, again with the possibility of parole after 15 years, 18 USC 4202.

## C. The State Trial and Appeal

On November 18, 1974, defendants moved to dismiss the pending state first-degree felony-murder charges on the ground that a successive state trial would put defendants twice in jeopardy. Both motions were denied by the trial court on December 30, 1974, and an order granting stay of proceedings pending interlocutory appeal and entered in each case. On July 7, 1975, the Court of Appeals denied defendants' applications for leave, citing its decision in *People v Cooper,* 58 Mich App 284; 227 NW2d 319 (1975). This Court denied defendants' applications for leave to appeal.

Defendants separately proceeded to trial in the state circuit court on the charge of first-degree felony murder, MCL 750.316; MSA 28.548, which the trial court quoted in the first paragraph of its following charge relative to defendant Gay:

"The statute that applies to this case reads as follows: 'All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate, or premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any robbery shall be murder in the first degree [and shall be punished by solitary confinement at hard labor in the state prison for life', MCL 750.316; MSA 28.548].

"The defendant in this case is charged with a criminal offense which is sometimes commonly referred to as felony murder. The phrase 'felony murder' applies to all

killings which occur during the perpetration or attempted perpetration of the crime of robbery.

"In order to find this defendant guilty of felony murder or in other words first-degree murder, it will be necessary for the prosecution to have proven three elements of the offense to your satisfaction beyond a reasonable doubt. First, it must be proven beyond a reasonable doubt that a robbery or attempted robbery occurred on the date and at the location alleged by the people.

"Secondly, it must be proven beyond a reasonable doubt that Connie Adams was killed during the perpetration or attempted perpetration of the robbery.

"Thirdly, the prosecution must have proven beyond a reasonable doubt that this defendant knowingly participated in the commission of the robbery or attempted robbery.

\* \* \*

"To find this defendant guilty of the crime charged, you must be satisfied beyond a reasonable doubt that the defendant did participate in the commission of the robbery and that he did so knowingly. By the word 'knowingly' is meant that the defendant knew he was committing a robbery. It is not necessary that the defendant have intended or even knew that a person would be killed during the perpetration or attempted perpetration of a robbery. It is not even material if there was an agreement before the robbery that no one would be injured or killed. Likewise, it is also not material if the killing of a person during the robbery was accidental. The only intent of the defendant that need be proven beyond a reasonable doubt is his intent to commit a robbery. If you do not find that the defendant intended to commit a robbery, then you must find the defendant not guilty.

"However, if you find that the people have proven beyond a reasonable doubt that a robbery as charged did occur and that Connie Marie Adams was killed during the perpetration or attempted perpetration of such robbery and that the defendant did knowingly commit the robbery, then you must find the defendant guilty as charged."

Defendant Gerlofs' jury was instructed on first-degree felony murder in substantially identical language.

Both defendants were separately convicted of first-degree felony murder and, pursuant to the mandatory terms of that statute, were sentenced to "solitary confinement at hard labor in the state prison for life".

Both defendants appealed their state conviction to the Court of Appeals on the ground that this Court's decision in *People v Cooper,* 398 Mich 450; 247 NW2d 866 (1976), had been violated; defendant Gerlofs additionally filed a motion for peremptory reversal. On June 16, 1977, the Court of Appeals considered defendant Gerlofs' application and remanded his cause to the trial court for consideration of the double jeopardy issue in light of this Court's *Cooper* decision.

On remand, the trial court issued an opinion vacating defendant Gerlofs' first-degree felony-murder conviction and dismissing the information with prejudice. The trial judge concluded that: the maximum penalties of the federal and state statutes—18 USC 2113(e) and MCL 750.316—are not greatly disparate; the federal authorities vindicated Michigan's interest in securing a conviction; and, the federal and state statutes are merely jurisdictionally rather than substantively different. Attached to the trial court's opinion was a personal letter written by the judge which elaborated on the reasons for vacating defendant Gerlofs' conviction.

On December 7, 1977, the Court of Appeals affirmed the trial court's opinion and granted defendant Gerlofs' motion for peremptory reversal. Likewise, on January 6, 1978, the Court of Appeals reversed defendant Gay's first-degree felony-mur-

der conviction and remanded the cause for dismissal of the information on authority of this Court's decision in *People v Cooper* and the trial court's opinion on remand in *People v Gerlofs.*

## II. ISSUES

On May 8, 1978, we granted leave to appeal in this matter limited to the following issues: "(1) whether the double jeopardy rule laid down in *People v Cooper,* 398 Mich 450 (1976), should be applied retroactively; (2) whether the state and federal prosecutions in the instant case served substantially different interests".

We agree with our Brother MOODY that the first issue should be resolved in the affirmative; we will not address that issue further. We respectfully disagree, however, with our colleague's resolution of issue two. Rather, we hold that, pursuant to the teachings of *People v Cooper,* the state and federal prosecutions in the instant matter did serve substantially different interests, thereby permitting successive prosecutions for Connie Marie Adams' death during the commission of defendants' robbery. The Court of Appeals must therefore be reversed and defendants' convictions of first-degree felony murder must accordingly be reinstated.

### III. *PEOPLE V COOPER:* SUBSTANTIALLY
### DIFFERENT INTERESTS ANALYSIS

In *People v Cooper,* 398 Mich 450; 247 NW2d 866 (1976), this Court assessed the constitutional propriety of successive state and federal prosecutions for an offense arising from the same criminal transaction. Adopting the Pennsylvania Supreme Court's approach in *Commonwealth v Mills,* 447 Pa 163; 286 A2d 638 (1971), to this issue, this

Court offered the following general rule for resolving this inquiry:

"* * * Const 1963, art 1, § 15 prohibits a second prosecution for an offense arising out of the same criminal act unless it appears from the record that the interests of the State of Michigan and the jurisdiction which initially prosecuted are substantially different. Analysis on a case-by-case basis cannot be avoided." *Cooper,* 461.

"When state and Federal interests do coincide, prosecution by one sovereign will satisfy the need of the other." *Id.,* 460.

Elaborating on this substantially different interests guideline with more specific detail, the Court pronounced the following "nonexclusive factors", *People v Formicola,* 407 Mich 293, 298; 284 NW2d 334 (1979), to be considered in determining whether a federal prosecution will satisfy this state's interests:

"Such factors, for prosecutions arising out of the same criminal act, may include [1] whether the maximum penalties of the statutes involved are greatly disparate, [2] whether some reason exists why one jurisdiction cannot be entrusted to vindicate fully another jurisdiction's interests in securing a conviction, and [3] whether the differences in the statutes are merely jurisdictional or are more substantive." *Cooper, supra,* 461.

The instant defendants were charged in federal court with bank robbery, assault with a dangerous weapon while committing a bank robbery, and killing Ms. Adams while committing a bank robbery. The state charge involved only first-degree felony murder relating to the death of Ms. Adams. In determining whether defendants' dual prosecutions violated former jeopardy, therefore, we need

only concern ourselves with whether the state first-degree felony-murder statute, MCL 750.316, and the federal robbery-killing statute, 18 USC 2113(e), satisfy substantially different interests as measured by *Cooper's* nonexclusive factors.[3] A review of those factors indicates that this inquiry must be resolved in the affirmative.

*A. The Maximum Penalties of the Statutes Involved Are Greatly Disparate*

The first factor suggested by the *Cooper* Court for ascertaining whether federal prosecution alone will satisfy this state's interests is "whether the maximum penalties of the statutes involved are greatly disparate". *Cooper, supra,* 461. We conclude that the subject statutes involve greatly disparate maximum penalties inasmuch as: (i) the Michigan first-degree felony-murder statute provides for a mandatory maximum/minimum penalty of life imprisonment without the prospect of parole; (ii) the federal statute more closely resembles the state second-degree murder statute and its penalty provision than it does the Michigan first-degree felony-murder penological scheme; and (iii) the *Cooper* sentencing scheme is inapposite to this matter since the present case involves different subsections of the federal bank-robbery statute and embraces a felony homicide rather than a non-homicide felony.

The federal count with which both defendants were charged, 18 USC 2113(e), provides for a mandatory minimum penalty of "not less than ten years" imprisonment. Since only a *mandatory*

---

[3] The fact that defendant Gay's § 2113(e) conviction and life sentence were reversed on appeal, subsequent to which he pled guilty to that offense and was sentenced to 99 years imprisonment, is irrelevant to this inquiry. This is so because, whether defendant Gay was convicted under or pled guilty to a violation of § 2113(e), the sentencing ramifications and substance of that offense remain the same.

*minimum* is expressly prescribed, the federal sentencing court may subject a defendant to a *discretionary maximum* penalty of any greater term of years, including life imprisonment. Thus, while the minimum sentence for violation of § 2113(e) is mandatory, the maximum sentence is entirely discretionary.

Further, whether the mandatory minimum or a discretionary maximum sentence is imposed, a federal prisoner may enjoy early release on parole pursuant to Chapter 311 of Title 18 of the United States Code.[4] Federal prisoners "may be released on parole after serving one-third of such term or terms or after serving *fifteen years of a life sentence* or of a sentence of over forty-five years". 18 USC 4202.[5] (Emphasis supplied.) Once the § 4202 baseline requirements are fulfilled, parole determinations are lodged solely within the discretion of

---

[4] As indicated in footnotes 1 and 2, *supra,* Chapter 311 of Title 18 of the United States Code, 18 USC 4201 *et seq.,* was repealed and replaced by Pub L 94-233, § 2, March 15, 1976, 90 Stat 219. Section 16(b) of Pub L 94-233 provided that, in all pertinent respects, the act was to become effective 60 days after the date of enactment. It is our understanding that this new chapter is not to be accorded retroactive effect to sentences or parole determinations levied prior to March 15, 1976, under the replaced chapter. See *White v Warden,* 566 F2d 57 (CA 9, 1977); *Daniels v Farkas,* 417 F Supp 793 (CD Cal, 1976).

Since both defendants were tried and convicted or pled in the federal court prior to May 15, 1976, it must be assumed that their parole determination and eligibility will be assessed in accordance with the structure and time provisions of the now-repealed chapter. All references in the text are therefore made to the repealed sections.

While the sections referenced and parole system described in the text have largely remained unaltered, one significant modification has occurred. Repealed § 4202 provided for parole eligibility "after serving *fifteen years* of a life sentence or of a sentence of over *forty-five years*"; newly enacted § 4205(a), however, provides for parole eligibility "after serving *ten years* of a life sentence or of a sentence of over *thirty years*". Although this modification works no difference as to defendant Gerlofs who received a 10-year sentence, it would have greatly impacted defendant Gay's parole eligibility (under either his conviction or plea), reducing the minimum parole term from 15 to 10 years.

[5] See footnotes 1 and 4, *supra.*

the Board of Parole. 18 USC 4203. As a general guideline, parole may be granted by that board in its discretion if "there is a reasonable probability that such prisoner will live and remain at liberty without violating the law, and if * * * such release is not incompatible with the welfare of society". 18 USC 4203(a). Parole release may be sought by the prisoner, 18 USC 4203, by recommendation of various federal authorities, 18 USC 4203, or expressly stipulated in the court's sentencing judgment, 18 USC 4208. In its discretion, the sentencing court may either (i) provide for parole eligibility when the prisoner has satisfied a minimum term of imprisonment less than one-third of the maximum sentence imposed, or (ii) establish a maximum penalty with the proviso that future parole determinations are ceded to the Parole Board's discretionary authority. 18 USC 4208(a).

The Michigan first-degree felony-murder statute, MCL 750.316; MSA 28.548, expressly provides that its violation "shall be punished by solitary confinement at hard labor in the state prison for life". Solitary confinement at hard labor for life, therefore, evidences both the *mandatory maximum and mandatory minimum* sentence. There exists no room for discretion in the state sentencing court's imposition of the life imprisonment penalty.

Persons convicted pursuant to the Michigan first-degree felony-murder statute are not eligible for parole release in this state. See MCL 791.234(4); MSA 28.2304(4); MCL 791.233b(n); MSA 28.2303(3)(n); *People v Allen,* 39 Mich App 483, 502; 197 NW2d 874 (1972) (LEVIN, J., dissenting), *rev'd on other grounds* 390 Mich 383; 212 NW2d 21 (1973) (adopting dissent of LEVIN, J.). Through this statutory preclusion of parole eligibility, it can

be logically assumed that the Legislature has deemed the first-degree murder convict "a menace to society or to the public safety". See MCL 791.233(1)(a); MSA 28.2303(1)(a). Such persons are likewise precluded from receiving probation. MCL 771.1; MSA 28.1131. Only through a discretionary grant of executive clemency may a state prisoner convicted under this statute be released prior to serving the mandatory sentence of life imprisonment. See Const 1963, art 5, § 14. See also MCL 791.244; MSA 28.2314.

Comparing these federal and state statutes, we must conclude that their maximum penalties are "greatly disparate". While the federal statute, § 2113(e), provides for a *mandatory minimum* sentence of "not less than ten years" potentially subject to a *discretionary maximum* of any greater terms of years including life, the Michigan statute, MCL 750.316, posits *no discretion* in the sentencing court and provides a *mandatory maximum/ minimum* sentence of "solitary confinement at hard labor * * * for life". Further, while the federal statutory scheme, 18 USC 4201 *et seq.,* provides for *discretionary parole eligibility* and release after serving 15 years of a discretionary life sentence, the Michigan Legislature has *precluded any eligibility for parole* release subsequent to a conviction of first-degree felony murder; although persons convicted under that and other state statutes may petition the Governor for executive clemency, including commutation, our research discloses that such release has been granted only sparingly in the past half-century.[6] Thus, while the federal judiciary may exercise its discre-

---

[6] Our research discloses the following data relative to the number of commutations awarded since 1938 of all state first-degree murder mandatory life imprisonment sentences as well as the average number of years served prior to commutation:

tion and be more lenient in its discretionary sen-
tencing and release determinations subject to the
ten-year mandatory minimum, it is not capable of
being as harsh as the state judiciary in its manda-
tory task of imposing unqualified life imprison-

| Year | Number of Commutations | Average Number of Years Served Prior to Commutations |
|------|------------------------|-----------------------------------------------------|
| 1938 | 4 | 13 |
| 1939 | 1 | 11 |
| 1940 | 3 | 21 |
| 1941 | 0 | — |
| 1942 | 3 | 21 |
| 1943 | 0 | — |
| 1944 | 2 | 27 |
| 1945 | 3 | 19 |
| 1946 | 5 | 21.2 |
| 1947 | 1 | 32 |
| 1948 | 11 | 25 |
| 1949 | 10 | 23 |
| 1950 | 12 | 24 |
| 1951 | 7 | 25 |
| 1952 | 10 | 23 |
| 1953 | 5 | 30 |
| 1954 | 7 | 23 |
| 1955 | 11 | 25 |
| 1956 | 6 | 25 |
| 1957 | 11 | 27 |
| 1958 | 15 | 27 |
| 1959 | 24 | 27 |
| 1960 | 25 | 30 |
| 1961 | 24 | 28 |
| 1962 | 52 | 26 |
| 1963 | 24 | 29 |
| 1964 | 13 | 26 |
| 1965 | 16 | 19 |
| 1966 | 15 | 24 |
| 1967 | 23 | 21 |
| 1968 | 16 | 24 |
| 1969 | 13 | 27 |
| 1970 | 10 | 24 |
| 1971 | 5 | 22 |
| 1972 | 8 | 21 |
| 1973 | 21 | 27 |
| 1974 | 9 | 21 |
| 1975 | 3 | 29 |
| 1976 | 2 | 20 |
| 1977 | 1 | 21 |
| 1978 | 0 | — |
| 1979 | 4 | 18.5 |

ment without any prospect of discretionary parole.

This great disparity in maximum penalties is made further significant when one discerns that the potential maximum penalty under the federal robbery-killing statute—not less than ten years imprisonment with a discretionary maximum life sentence—is closely similar to the potential maximum penalty available under Michigan's *second-degree murder* statute—"imprisonment in the state prison for life, or any term of years, in the discretion of the court", MCL 750.317; MSA 28.549, with eligibility for parole after ten years imprisonment, MCL 791.234(4); MSA 28.2304(4). In both the federal robbery-killing and state second-degree murder instances, therefore, a defendant must serve a mandatory minimum sentence of ten years in the event that a discretionary life sentence is imposed. Further, in both instances, a defendant is eligible for parole after serving at least ten years imprisonment.[7] This penological scheme is in marked contrast to the mandatory maximum/minimum penalty of life imprisonment at hard labor without the availability of parole pursuant to a *first-degree felony-murder* conviction.

Thus, juxtaposed, it can no more be said that the federal and state statutes evidence no great disparity in potential maximum penalties than it can be said that the Michigan first-degree felony-murder and second-degree murder statutes evidence no such disparity. Indeed, at least insofar as sentencing is concerned, it is manifest that the discretion-

[7] As discussed in footnotes 1 and 4, *supra,* federal parole eligibility for life imprisonment has been reduced from 15 to 10 years. Had defendant Gay been subject to this reduced eligibility provision, it is clear that the Michigan second-degree murder statute and the subject federal statute would have been identical in both the maximum penalty as well as release aspects.

ary federal robbery-killing subsection is as similar to the discretionary state second-degree murder statute as it is significantly dissimilar to the mandatory state first-degree felony-murder statute. This great disparity in the potential maximum penalties imposed for conviction of both second-degree and first-degree felony murder was remarked upon by LEVIN, J., dissenting, in *People v Allen,* 39 Mich App 483, 502; 197 NW2d 874 (1972), and subsequently adopted *verbatim* by this Court, 390 Mich 383, 386; 212 NW2d 21 (1973):

"Second-degree and first-degree [felony] murder are separate offenses. Offenders are subject to *significantly different penalties:* persons convicted of first-degree [felony] murder must be sentenced to life imprisonment and may not be paroled; persons convicted of second-degree murder may be sentenced to life imprisonment—parolable after ten years imprisonment—but, in the discretion of the sentencing judge, they may be sentenced to any term of years, and many are placed on probation. A definitional difference which makes for such a *radical difference in the law's view of an offender's culpability and in the punishment to which he may be or must be subjected* is clearly an essential element." (Emphasis supplied.)

Finally, we are unpersuaded that the penalties involved in this matter are no more disparate than those considered in *Cooper.* In fact, we find the disparity of the sentencing scheme involved in *Cooper* to be incomparably less than that presented in the instant matter.

In *Cooper,* defendant was charged and acquitted in federal court of having violated the federal bank-robbery statute, 18 USC 2113(a), which carries a discretionary maximum penalty of not more than 20 years imprisonment. Defendant stood convicted in state court of bank robbery and assault

with intent to rob being armed. Both state offenses carry a discretionary maximum penalty of life or any term of years; defendant was sentenced to a concurrent term of 5 to 25 years on each count.[8]

Although the *Cooper* Court did not specifically analyze the comparability of the state and federal potential maximum penalties, even a cursory perusal of those penological schemes reveals that defendant therein was confronted with discretionary sentencing in *both* the state and federal courts and mandatory eligibility for discretionary parole release in *both* judicial systems. Unlike *Cooper,* the instant defendants are confronted with wholly unparallel punishment provisions. Here, defendants are subject to mandatory life imprisonment without any possibility of parole in the state system; in the federal system, however, defendants are merely subject to a mandatory minimum ten-year sentence—subject to a discretionary maximum penalty of life imprisonment—further qualified by mandatory eligibility for discretionary parole. The great disparity in the instant penalties as well as the incomparability of *Cooper* to the present proceeding is apparent. While the subject statutes in *Cooper* were harmonious, the instant statutes are patently discordant.

The alleged precedential guidance of *Cooper* with respect to the instant sentencing inquiry is also invalid since that case involved the comparison of offenses and sentencing schemes not in-

---

[8] Defendant's state conviction of attempted murder, which carries a discretionary maximum penalty of life imprisonment or any term of years, was earlier reversed on other grounds by our Court of Appeals; since the prosecution did not cross-appeal that reversal, the Court was incapable of viewing that charge *vis-à-vis* the former jeopardy doctrine. In a separate concurrence, Justice COLEMAN intimated that, had the attempted murder prosecution been presented for review, that state prosecution "may well have involved interests substantially different from those addressed by the Federal statute". *Cooper, supra,* 465-466.

volved herein. While the *Cooper* Court was restricted in its sentencing inquiry to a comparison of *non-homicide* sentencing schemes, *i.e.,* state and federal bank robbery, the instant matter presents the need for comparison of *homicide* sentencing schemes, *i.e.,* the state statute involving first-degree murder sentencing and the federal statute essentially involving second-degree murder sentencing. Since the instant matter involves a homicide rather than a non-homicide offense and since the Michigan Legislature has chosen to punish first-degree felony murder with mandatory rather than discretionary life imprisonment as is the case in second-degree murder sentencing, we perceive this "radical difference in the law's view of an offender's culpability and in the punishment to which he * * * must be subjected" as further persuading this Court to find the penalty provisions of the instant state and federal statutes to be greatly disparate. *Allen, supra,* 39 Mich App 502. Because, distinguishably from the instant matter, our decision in *Cooper* was not required to address the comparability of homicide sentencing and its concomitant goals, we would be remiss in our analysis if we felt bound by that decision's inapposite strictures.

*B. The Differences in the Statutes Are Not Merely Jurisdictional But Are More Substantive in Nature*

Another "non-exclusive factor" to be considered in ascertaining whether the state and federal interests are "substantially different" is "whether the differences in the statutes are merely jurisdictional or are more substantive", *Cooper, supra,* 461. In Justice MOODY's recent opinion in *People v Formicola, supra,* 300, this factor was elaborated to include whether the statutes "differ as to the

type of conduct prohibited, as to the interests sought to be protected, and as to the proofs required to establish the prohibited offense". Although these specific indicia are not necessarily to be regarded as the sole expression of the general "substantive distinction" inquiry, we nevertheless find that at least two of the three have been fulfilled in this instance.

Although the provisions superficially share the common element that death occur during the perpetration of a robbery, the federal bank-robbery statute augmented by its robbery-killing subsection and the Michigan first-degree felony-murder statute are "substantially different" in terms of their substantive requirements for at least two dispositive reasons. First, the federal statute essentially punishes second-degree murder culpability, whereas the state statute is Michigan's first-degree murder statute which penalizes that "more atrocious" offense. Second, the federal bank-robbery-killing enactment treats the fact of a killing as an aggravation of the bank-robbery offense, and its concomitant sentence, whereas the exclusive purpose of the state first-degree felony-murder statutory provision is to protect the public against murder whether committed during a personal or a property offense including, but not limited to, robbery.

As to the first reason, our analysis in Part IIIA, *supra,* of the penological differences between the statutes clearly concluded that the federal law proscribes and punishes culpability for second-degree murder, whereas the Michigan statute patently proscribes and punishes culpability for first-degree murder. This Court has early acknowledged that first-degree murder is a "more atrocious" offense than its second-degree counterpart, *People*

*v Potter,* 5 Mich 1, 7 (1858); *People v Morrin,* 31 Mich App 301, 326-327; 187 NW2d 434 (1971), and that the substantive distinction between these offenses reflects a "radical difference in the law's view of an offender's culpability and in the punishment to which he may or must be subjected", *People v Allen, supra,* 39 Mich App 502. Further exegesis would be redundant.

As to the second reason for our finding that the litigated statutes are substantively dissonant, comparison of their terms demonstrates the disparate interest each has been enacted to serve and protect. On the one hand, it is clear that the federal bank-robbery statute is essentially an enactment to protect the property and security of federal banking institutions with the fact of either personal assault or killing merely augmenting the punishment. On the other hand, it is clear that the state enactment is a first-degree murder statute solely directed toward the protection of human life. The pertinent sections of the federal bank-robbery statute, 18 USC 2113, provide as follows:

**"§ 2113. Bank robbery and incidental crimes**

"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

"Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

"(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; or

"Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

"(e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years * * *.

"(f) As used in this section the term 'bank' means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, and any bank the

deposits of which are insured by the Federal Deposit Insurance Corporation."

In contrast, the state statute provides:

[MCL 750.316. *First-degree murder.]*
"Sec. 316. All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping, shall be murder of the first degree, and shall be punished by solitary confinement at hard labor in the state prison for life."

Addressing the latter enactment, it is elemental that the Michigan first-degree felony-murder statute has as its principal purpose the protection of human life and the punishment of extreme culpability. This is so whether life is taken during the commission of a premeditated murder or a murder in connection with either an enumerated personal offense, *e.g.,* rape and kidnapping, or an enumerated property offense, *e.g.,* arson, robbery, burglary, larceny and extortion. MCL 750.316; MSA 28.548.

The purpose of the federal bank-robbery statute, 18 USC 2113, including the incidental offense of robbery-killing, § 2113(e), is to "safeguard the stability and integrity of federal banks". See *Way v United States,* 268 F2d 785, 786 (CA 10, 1959). Specifically addressing the robbery-killing subsection of this statute, § 2113(e), the United States Eighth Circuit Court of Appeals in *United States v Delay,* 500 F2d 1360, 1368 (CA 8, 1974), stated: "The crime which Congress has defined and for which it has provided punishment is that of bank robbery and the various sections of the statute *[e.g.,* § 2113(e)] merely define different degrees of

that same crime". Robbery-killing under the federal statute, therefore, is not to be considered a separate offense, but rather as aggravating the penalty for the underlying property offense, *i.e.,* bank robbery. Through its enactment of § 2113, Congress created one offense, bank robbery, which is to receive one punishment, the severity of which is to be determined by the nature of the accompanying aggravating circumstances. See *United States v Delay, supra,* 1368; *United States v Hicks,* 524 F2d 1001 (CA 5, 1975).

The principal purposes of the state and federal statutory schemes are clearly different. While the federal statute seeks to safeguard the financial stability and integrity of federal banks alone, the Michigan statute has as its principal purpose the protection of human life by punishing the commission of a premeditated murder or a murder in connection with either an enumerated personal or property offense not limited to robbery alone. Further, unlike the Michigan statute which stands as a separate offense to punish the taking of human life as first-degree murder, the incidental federal provision pertaining to a killing during a bank robbery stands in aggravation of the sentence for the underlying bank robbery and not as a separate offense. Thus, while the state and federal prosecutions admittedly involve the same transaction, each is based on a substantively different offense forwarding a different purpose and protecting a different interest.[9]

---

[9] We find the instant homicide prosecutions to be distinguishable from the robbery and assault prosecutions involved in *Cooper,* where we stated that "[t]he laws of both jurisdictions [18 USC 2113(a) (robbery) and MCL 750.531; MSA 28.799 (robbery), MCL 750.89; MSA 28.284 (assault)] seek to insure the safety of individuals and the protection of private property". *Cooper, supra,* 462.

The statutes under consideration in the instant matter solely relate to the death of a person during the commission of a robbery; more

Although we do not consider it necessary to our decision, we note in passing that a further substantive distinction existed between these statutes as framed by the state and federal jury instructions reprinted in Part I, B and C, *supra.* This substantive disparity resides in the recognition that, at the time of defendants' trials, the federal jury was permitted to infer the *mens rea* element of killing in assessing guilt of robbery-killing *United States v Delay, supra,* 1363-1364. The state juries, on the other hand, were not presented with a similar *mens rea* instruction in assessing guilt for first-degree felony murder; rather, that element was withdrawn from the juries' contemplation and was imputed or implied as a matter of law. Although we find this substantive difference in proofs illuminating, we do not find this divergence a part of our present analysis, as that matter is pending this Court's decision in *People v Aaron* (Docket Nos. 57376, 61140, and 61194).[10]

## C. The Federal Jurisdiction Cannot Be Entrusted to Vindicate Fully Michigan's Interests in Securing a Conviction

As to the final non-exclusive factor of the *Cooper* analysis, for the reasons stated in Part IIIB, *supra,* we find that "some reason exists why [the federal] jurisdiction cannot be entrusted to vindicate fully [Michigan's] interests in securing a conviction". *Cooper, supra,* 461. In so ruling, we do not mean to intimate that the federal authorities did not vigorously, competently, and swiftly attempt to secure a robbery-killing conviction; the record reflects a

than safety and the protection of property are therefore at stake in the instant statutory analysis.

[10] We also note that even if defendants could have been prosecuted under the federal first-degree murder statute, 18 USC 1111(a), that statute likewise requires, at minimum, inferential proof of *mens rea.*

commitment quite to the contrary. Rather, due primarily to the substantive differences of the subject statutes, the federal authorities were impeded in vindicating this state's different interests in securing a conviction. Indeed, the fact of the matter is that even if the federal authorities had desired to prosecute defendants for first-degree murder, 18 USC 1111(a), as did the state prosecutor, the federal authorities could not have jurisdictionally done so since Ms. Adams neither expired on a federal reservation nor was she a federal officer. 18 USC 1114 *et seq.*

### IV. CONCLUSION

Under the facts of this case, we hold that the state and federal interests involved are "substantially different" and that federal prosecution alone could therefore not satisfy this state's immediate interests. Accordingly, we must conclude that dual prosecution was warranted. We reverse the Court of Appeals reversal of defendants' state, first-degree felony-murder convictions and remand the matter for their reinstatement. We concur in our Brother MOODY's holding that the double jeopardy rule enunciated in *Cooper* should be applied retroactively in the instant matter.

COLEMAN, C.J., and FITZGERALD, J., concurred with WILLIAMS, J.